UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SIGMUND RUMPF,

                        Petitioner,                    Case No. 1:20-cv-368

v.                                             Honorable Paul L. Maloney

CATHERINE S. BAUMAN,

                        Respondent.

_____/

## REPORT AND RECOMMENDATION

On April 29, 2020, Petitioner Sigmund Rumpf, with the assistance of counsel, filed his habeas corpus petition under 28 U.S.C. § 2254 raising two grounds for relief, as follows:

    I.      Trial counsel violated Mr. Rumpf's Sixth and Fourteenth Amendment rights to effective assistance of counsel where trial counsel (1) put the defendant on the stand with the knowledge that it would expose him to catastrophic impeachment evidence [and] (2) failed to make a record regarding the jury seeing the defendant being escorted out of the courthouse and into a marked police car, by four uniformed officers.

    II.     Defendant was denied his constitutional right to a fair trial when he was escorted from the courthouse by four armed officers, to a marked police car, within the view of jurors and defense counsel was ineffective for failing to object.

(Pet., ECF No. 1, PageID.4–5.)  Respondent has filed an answer to the petition (ECF No. 5) stating that the grounds should be denied because they lack merit.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty

Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless. Accordingly, I recommend that the petition be denied.

**Discussion**

## I.   Factual allegations

Petitioner Sigmund Rumpf is incarcerated with the Michigan Department of Corrections at the Newberry Correctional Facility (NCF) in Newberry, Luce County, Michigan. On March 28, 2016, following a six-day jury trial in the Barry County Circuit Court, Petitioner was convicted of manslaughter, in violation of Mich. Comp. Laws § 750.321; carrying a concealed weapon, in violation of Mich. Comp. Laws § 750.227; and felony-firearm, in violation of Mich. Comp. Laws § 750.227b. On May 12, 2016, the court sentenced Petitioner. Petitioner challenged his sentence on appeal. The Michigan Court of Appeals reversed his sentences and remanded to the trial court for resentencing. Petitioner was resentenced on March 11, 2019, to concurrent prison terms of five to fifteen years for manslaughter and two to five years for carrying a concealed weapon, to be served consecutively to a two-year sentence for felony firearm.

The Michigan Court of Appeals recounted the facts underlying Petitioner's convictions as follows:

> Barry County Sheriff's Deputy Nicholas Seifert arrested defendant on July 21, 2015, for the same-day shooting death of Steven Kauffman, the boyfriend of defendant's friend, Morgan Wire. At the time of the killing, Wire had been dating Kauffman for a few weeks. At defendant's trial, Wire described Kauffman as a jealous boyfriend and said that if he saw her talking with another man, he automatically thought she was cheating on him. She testified that on the day of the shooting, she and Kauffman had driven to South Haven, drinking alcohol along the way. They continued drinking once they arrived at the

2

pier, got into an argument, and headed back toward Kalamazoo, drinking and arguing along the way.  Wire said that at one point, Kauffman yelled at her and hit her in the face.  They pulled into a Speedway gas station outside Kalamazoo; as the Mountaineer slowly rolled to a stop, Wire was unlatching the seatbelt and opening the door when Kauffman pushed her out of the car and started to drive off.  She fell out of the car and scraped her elbow.  Kauffman made a U-turn, pulled back into the gas station lot, parked the car, got out, and walked around in an attempt to cool off.  Wire testified that she then jumped into the SUV and drove away, leaving Kauffman at the gas station.  Wire did not know where her phone was because things "had been thrown around in the car," so she went to the bar in Delton where she worked and borrowed a friend's phone and Facebook account to message defendant.  She asked him to go to her cottage on Pickerel Cove and get her dog before Kauffman tried anything, and told him that Kauffman had hit her and pushed her out of the car.

Defendant testified that on the day of the shooting, . . . he and his brother planned to ride together to the Waldorf Brewpub and Bistro for team trivia night.  His brother was going to drive, and defendant parked his Jeep under the carport at his parents' home, where he lived.  He left a gun case containing his Remington 1911 tucked in the "gap between the backseat and the rear of the trunk" of his Jeep.  Defendant testified that he had intended to take the gun to a local gun store earlier that day to have it fitted for Tritium night sights, but arrived at the store after it had closed.  He left the gun case in the Jeep because he planned to take it to the gun store the following day.  Defendant said that the gun was not loaded when he was driving around with it in his Jeep.  Defendant recounted that as he and his brother were in the driveway getting ready to leave for team trivia at around 6:30 p.m., he began to get Facebook messages from a woman he did not know, but soon realized were from Wire.  Defendant said he had met Wire three or four years prior, and for two or three months afterwards had been romantically interested in her.  Defendant testified that when he got the messages, he thought Wire was in trouble and needed his help.  He explained that he did not remove the gun case from its location in the Jeep before leaving his house for Wire's cottage.

Defendant was already at the cottage when Wire arrived.  Wire testified that she grabbed her dog and a few possessions and planned to go to defendant's house.  While she was at the cottage, Wire received a message from Kauffman's mother that said something about Kauffman coming to get his stuff, and that made her feel "kinda scared."  As she was leaving, Wire walked by defendant's Jeep and saw an open gun case with a gun in it on the passenger seat.  Wire admitted that, for a while,

she did not tell deputies or the prosecutor about the gun, but eventually told one of the detectives on the case about it because she felt bad about lying.  The two left Wire's cottage in separate vehicles, Wire in her white Mountaineer and defendant following in his yellow Jeep Wrangler. They drove toward Hastings, eventually turning onto Wildwood Road.

Wire and defendant offered conflicting testimony about what happened next.  Wire testified that as they rounded a curve in the eastbound lane of Wildwood Road, she saw Kauffman driving "pretty fast" in the westbound lane in his mother's SUV.  Shortly thereafter, she saw in her rearview mirror that Kauffman's SUV was coming up behind her and defendant.  She pulled onto the shoulder of the road, intending to tell Kauffman where she had put the keys to his car, which was parked at the cottage.  Kauffman pulled over behind her, and defendant pulled over a few car lengths behind Kauffman.  Defendant testified that once they were on Wildwood Road driving east, he felt a jolt, as if he had hit a pothole, and saw what turned out to be Kauffman driving behind him in a silver SUV.  Defendant said that the SUV approached on his left, and that when he looked over to see what was going on, he saw Kauffman leaning over the console with an angry expression on his face, looking at defendant as if defendant had done something wrong. Kauffman then cranked his steering wheel to the right, cutting into defendant, which caused defendant to crank his steering wheel to the right and run off the roadway.  Defendant said that Kauffman then sped up toward Wire's car, and he saw both cars jolt at the same time, which made him think—although he could not say for sure—that the man had rear-ended Wire's car.  According to defendant's account, only then did the two SUV's pull off to the side of the road, Wire's in front and Kauffman's close behind. Wire testified that she did not see Kauffman's SUV pass or strike defendant's Jeep.  Christine Gregory, a forensic scientist in the trace evidence unit at the Michigan State Police Lab, testified that she examined defendant's Jeep and the Toyota Forerunner Kauffman had been driving and did not find any evidence of damage to the rear end or spare tire of defendant's Jeep or evidence of the transfer of materials between the two vehicles.

Defendant testified that once the cars were on the side of the road, Kauffman walked toward Wire's car, yelling very loudly.  By this time, defendant testified, he had figured out that the man was probably Wire's boyfriend and he was concerned for Wire.  Defendant said that he got out of his car and yelled at Kauffman in order to draw his attention from Wire, upon which Kauffman turned and started yelling at him, at some point asking if defendant "was the one f****** Morgan" and stating that he was "gonna kick my f***** ass."  Defendant said that this caused him some concern; he was not a person who got into fights, he had never been

in a fight in his adult life, and he did not know how to defend himself with his hands. Defendant testified that Kauffman came at him, leaning forward with clenched fists, and that he was scared, so he got the gun case out of the back of his Jeep, thinking that the sight of the gun would diffuse the situation. Defendant recounted that he put one bullet in the magazine, but did not chamber the round, and stood by the open door of his Jeep with the gun pointed toward the ground, telling Kauffman to "cease and desist," that he had a gun, and that he would defend himself. Defendant said he learned to do this while on "fire watch" in the Marines; it was how one reacted when someone had breached the perimeter.

Defendant testified that Kauffman responded by charging him and throwing a punch with his right hand that hit defendant in the left side of the head. He said the punch made him feel concussed, and his vision faded; he was fearful, confused, and afraid that Kauffman was going to kill him. He testified that Kauffman knew he had a gun but charged him anyway, which made him think Kauffman was crazy and irate. Defendant pushed Kauffman as hard as he could, and Kauffman fell to the ground, and defendant backed up, again telling Kauffman to cease and desist and that he would defend himself. Kauffman charged him again, this time kicking him just below the ribs on his left side, and punching him in his right shoulder. Defendant pushed Kauffman again, but Kauffman did not fall down; at this point defendant chambered the round. When Kauffman came at him again, defendant backed up and leveled the gun at him. Kauffman stopped immediately and defendant recalled thinking that the situation had been resolved; he again told Kauffman to cease and desist, and said it was his final warning. According to defendant, Kauffman told him he was "too much of a p****and he's gonna take the gun, shove it up my ass and kill me with it." Defendant said that he believed what Kauffman said and thought Kauffman was going to hurt him. When Kauffman ran toward defendant and lunged at him, defendant fired. Defendant testified that he had not wanted to pull the trigger and he felt fear of death as he pulled it; he was afraid that if Kauffman took the gun from him, he would be dead.[1]

---

[1] Wire did not recall seeing defendant outside his Jeep or the Jeep's door open. She said the two men yelled at each other a bit, and then she heard what she believed to be two gunshots. She looked back and saw Kauffmann lying in the road. Wire said that she had the radio on in the car and was dividing her attention between the two men and her dog in the back seat, but the intervals between her looking back at the men

were not long enough for her to have missed a fistfight.
_____

Defendant further testified that after approaching Kauffman's body and thinking him dead, he told Wire to call 911, forgetting that she did not have a phone, but Wire left the scene. Defendant said he went back to his Jeep and put the gun back in its case and the gun case back behind the seat, and started for home. Defendant's phone records indicate that he attempted to dial 911 at 7:40 p.m., but the call did not go through. Defendant testified that upon arriving at home, he parked his Jeep, put the gun case on a table in the garage, entered the house and used a landline to call 911; records show that the call went out at around 7:56 p.m. The prosecution played the 911 call for the jury, which heard defendant say that he had shot someone in self-defense and that Morgan Wire had been present at the scene. While he was on the phone with the 911 operator, defendant messaged Wire, stating "'I called 911 so' t-a [sic, "ya"] 'know and don't tell anyone[.]'" Defendant testified that he was feeling physically drained and ill when he returned home, and that the background noises audible on the 911-call are him vomiting. When the police arrived, defendant followed the instructions of the 911 operator and went outside with his hands in the air. He made contact with Deputy Seifert, whom he directed to the gun in the garage and voluntarily accompanied to the sheriff's department.

Deputy Seifert testified that he made contact with defendant at his house between 8:00 p.m. and 8:30 p.m., that he got a good look at defendant's face, and that he had no bruises, scratches, or marks of any kind, and his clothing was not ripped. He said that defendant accompanied him to the Sheriff's Department at around 8:30 p.m., and that he then took defendant to the hospital because defendant continued to vomit and reported that he had Crohn's disease. Seifert testified that while they were waiting to see a doctor, he had a conversation with defendant that was recorded on a pocket recorder that the deputy had activated on the way to defendant's house.[2] Seifert testified—and defendant affirmed under cross-examination—that defendant did not say that he was trying to save his life, that he feared for his life, that he thought he was going to be killed or seriously injured, or that he thought Kauffman had a weapon. He did not describe Kauffman as wild-eyed and deranged or that Kauffman said anything about sleeping with his girlfriend or threatened to "kick [defendant's] ass." Defendant did not describe how he put one bullet into the empty magazine of his pistol, say Kauffman had hit him so hard he could not see, that his head was swimming, or that Kauffman had hit him in the shoulder and kicked him in the ribs.[3] Seifert testified that this was the only time during the nearly four hours that he was with defendant that defendant talked

about the shooting.  Seifert acknowledged on cross-examination that defendant had appeared calm, pleasant, polite, and cooperative, and that defendant had answered every question Seifert had asked of him, and that he had not asked defendant about the details of the shooting, or about whether defendant had feared for his life.

_____

[2] The trial court admitted into evidence an excerpt of the conversation during which defendant talked about the shooting.

[3] When describing the incident to Seibert [sic], defendant stated that Kauffman "swung" and he "ducked" and backed up, but later in the conversation he commented, "My head hurts.  Must –must have been from where he hit me."

(Mich. Ct. App. Op., ECF No. 6-29, PageID.1263–1267.)  Although Petitioner takes issue with the court of appeals' conclusions, he does not challenge the court's recitation of the testimony that was elicited at trial.  "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)."  *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016) (footnote omitted).

Petitioner's direct appeal of his convictions and sentence included the issues Petitioner now raises by way of his habeas petition.  By opinion issued January 30, 2018, the court of appeals addressed the issues on the merits, rejecting Petitioner's challenges and affirming the convictions.  As noted above, however, the appellate court agreed with Petitioner's challenges regarding his sentences.  The court of appeals reversed Petitioner's sentences and remanded the case to the trial court for resentencing.

Petitioner sought leave to appeal the court of appeals' unfavorable rulings to the Michigan Supreme Court.  That court denied leave initially by order entered October 2, 2018, (Mich. Order, ECF No. 6-31, PageID.1670), and upon reconsideration by order entered February 4, 2019, (Mich. Order, ECF No. 6-31, PageID.1640).

On remand, Petitioner was resentenced as set forth above.  Petitioner preserved his appeal of the amended judgment of sentence by filing a notice of appeal. Eventually, however, he stipulated to the dismissal of that appeal (ECF No. 6-30, PageID.1630–1632), choosing instead to file his habeas petition in this Court.

## II.    AEDPA standard

The AEDPA "prevent[s] federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693–94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).  "Under these rules, [a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Stermer v. Warren*, 959 F.3d 704, 721 (6th Cir. 2020) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))

8

(internal quotation marks omitted)).  This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Williams v. Taylor*, 529 U.S. 362, 381–82 (2000); *Miller v. Straub*, 299 F.3d 570, 578–79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34, 37–38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

Determining whether a rule application was unreasonable depends on the rule's specificity. *Stermer*, 959 F.3d at 721. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664. "[W]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546–547 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Section 2254(d) limits the facts a court may consider on habeas review. The federal court is not free to consider any possible factual source. The reviewing court "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180 (2011). "If a review of the state court record shows that additional fact-finding was required under clearly established federal law or that the state court's factual determination was unreasonable, the requirements of § 2254(d) are satisfied and the federal court can

10

review the underlying claim on its merits.  *Stermer*, 959 F.3d at 721 (citing, *inter alia*, *Brumfield v. Cain*, 576 U.S. 305 (2015), and *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007)).

If the petitioner "satisfies the heightened requirements of § 2254(d), or if the petitioner's claim was never 'adjudicated on the merits' by a state court, 28 U.S.C. § 2254(d),"—for example, if he procedurally defaulted the claim—"AEDPA deference no longer applies." *Stermer*, 959 F.3d at 721.  Then, the petitioner's claim is reviewed *de novo*.  *Id*. (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)).

## III.  Ineffective assistance of trial counsel

Petitioner raises two distinct ineffective assistance of counsel claims.  The first, relating to counsel's encouraging Petitioner to take the stand, is addressed here.  The second, relating to counsel's failure to develop and raise a specific due process claim, is addressed below.

On direct examination, Petitioner testified that the victim threatened him with physical violence:

| | |
|---|---|
| Petitioner: | The first thing he said to me I—I couldn't quite understand, but after that he asked me if I was the one fucking Morgan, and then he told me he was gonna kick my fuckin' ass. |
| Counsel: | Okay.  Did that cause you some concern? |
| Petitioner: | Yes. |
| Counsel: | Are you somebody who gets in fights? |
| Petitioner: | No. |
| Counsel: | Have you been in a fight during your adult life? |
| Petitioner: | No. |

11

Counsel:      Did you know how to defend yourself with your hands?

Petitioner:   No.

                                    *        *        *

Counsel:      Okay.  Were you scared?

Petitioner:   Yes.

Counsel:      Why?

Petitioner:   I haven't been in a fight since elementary school . . . .

(Trial Tr. IV, ECF No. 6-20, PageID.922.)   On cross-examination, Petitioner was forced to alter his testimony:

Prosecutor:   Now, you said you were in the Marines, right?

Petitioner:   Yes.

Prosecutor:   Where were you?

Petitioner:   I was at Paris Island.

Prosecutor:   Okay.

Petitioner:   South Carolina.

Prosecutor:   You were in South Carolina?

Petitioner:   Yes.

Prosecutor:   And for five months and then you were discharged?

Petitioner:   Yes.

Prosecutor:   Went through basic training, didn't you?

Petitioner:   Yes.

Prosecutor:   Okay.   They teach you self-defense in basic training, correct?

Petitioner:   Yes.

12

> Prosecutor: Okay.  I would imagine—I'm not a Marine, but I would imagine that you do have some hand-to-hand combat training?
>
> Petitioner: Not really.
>
> Prosecutor: None whatsoever?
>
> Petitioner: Just very basic.
>
> Prosecutor: All right.  Some training, though?
>
> Petitioner: Yes.
>
> Prosecutor: Okay.  You have gone through I would imagine practice situations with other Marines about—
>
> Petitioner: Yes.
>
> Prosecutor: Okay.  So the description of you having no self-defense training in hand-to-hand combat is wrong, correct?
>
> Petitioner: Yes.

(*Id.*, PageID.938.)

Additionally, during a police interview after the shooting Petitioner intimated that he had, in the past, been romantically interested in Morgan Wire, but that his interest had waned after 2 or 3 months.  On cross-examination, the prosecutor attacked the accuracy of that statement by reviewing with Petitioner statements that occurred long after the 2 to 3-month period that suggested Petitioner's interest in a romantic relationship with Ms. Wire continued.

Petitioner contends that these two areas of inquiry severely impeached his credibility.  Petitioner argues that counsel should have known that would occur if Petitioner were put on the stand.  Thus, according to Petitioner, it was professionally unreasonable for counsel to encourage or permit Petitioner to take the stand.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id.* at 687.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

Moreover, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 15 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the

question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740–41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

In resolving Petitioner's ineffective assistance claim, the Michigan Court of Appeals applied the following standard:

> Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009). . . . In order to establish ineffective assistance of counsel, defendant must show: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *Trakhtenberg*, 493 Mich at 51.

(Mich. Ct. App. Op., ECF No. 6-29, PageID.1268–1269.) Although the appellate court cited Michigan Supreme Court authority in support of the standard, the Michigan Supreme Court case cited relied on *Strickland*. *People v. Trakhtenberg*, 826 N.W.2d 136, 143 (Mich. 2012). Thus, the court of appeals applied the standard required by clearly established federal law.

The court of appeals resolved Petitioner's claim on the first prong of the *Strickland* analysis:

> Defendant contends that trial counsel performed below an objective standard of reasonableness by failing to analyze the discovery and to detect the potential impeachment material or by knowingly exposing him to harmful impeachment. Defendant asserts that having him testify had no strategic value and it was prejudicial because it undermined his credibility.

*    *    *

After reviewing the record, we conclude that contrary to defendant's assertion, his testimony did have strategic value because it provided the only source of information from which the jury could determine that defendant had acted in self-defense. In order to conclude that defendant killed Kauffman in lawful self-defense, the jury had to find that at the time defendant acted he "honestly and reasonably believed that he was in danger of being killed or seriously injured" and he "honestly and reasonably believed he needed to use deadly force in self-defense."  M Crim JI 7.15.  Although the 911 call shows that defendant said he shot a man in self-defense, Seifert testified that during the extended period of time he spent with defendant, defendant did not tell Seifert that he had feared for his life, thought Kauffman was going to kill or seriously injury him, or saw no escape but to shoot.  Thus, it was only through counsel's direct examination of defendant that the jury heard evidence that Kauffman had physically attacked defendant and that defendant honestly believed Kauffman was going to kill him, that he never wanted to take the life of another human being, that he saw no other way out, and that he was very afraid.

In addition, it was defendant's direct examination testimony that provided the jury with the facts necessary to find defendant guilty of voluntary manslaughter instead of murder.  As damaging as the cross-examination testimony may have been to defendant's claim of self-defense,[4] without defendant's direct examination testimony, the jury would not have heard anything about Kauffman's sudden attack, defendant's "passion and anger" during the attack, and the immediacy with which defendant acted, all factors necessary for a finding of voluntary manslaughter.  See M Crim JI 16.5.  Therefore, even if the prosecution's cross-examination did weaken defendant's claim of self-defense, without defendant's direct testimony, the testimony of the other witnesses at trial arguably would have been insufficient to enable the jury to determine that defendant committed manslaughter rather than murder.  Thus, putting defendant on the stand was a necessary—and one might argue successful—strategic decision.   Under these circumstances, we cannot say that trial counsel rendered constitutionally ineffective performance by having defendant testify.

---

[4] Under the prosecution's cross-examination, defendant admitted that he could have gotten back in his Jeep or called 911 at several points instead of staying and engaging Kauffman, that he had had some self-

defense training in the Marines, and that he did not shoot to incapacitate Kauffman, but to kill him.

(Mich. Ct. App. Op., ECF No. 6-29, PageID.1269–1270.)

Petitioner calls into question the court of appeals' determination that Petitioner's testimony was "the only source of information from which the jury could determine that defendant had acted in self-defense." (*Id*., PageID.1269.)  But Petitioner recasts the issue:  "The Court of Appeals dismissed [Petitioner's] argument, finding that there was strategic value in Mr. Rumpf's testimony that could refute [Deputy] Seifert's testimony that Rumpf never mentioned fear, or that he thought Kauffman was going to kill him, or saw no escape but to shoot him." (Pet'r's Br., ECF No. 1, PageID.45.)  That mischaracterizes the court of appeals' finding, fails to take into account the respective burdens of coming forward with evidence regarding self-defense, and fails to distinguish between actual evidence of Petitioner's fear and evidence that might corroborate Petitioner's claim that he was fearful.

The State of Michigan characterizes self-defense as an affirmative defense.  *See People v. Dupree*, 788 N.W.2d 399, 405 (Mich. 2010).  "An affirmative defense, like self-defense, 'admits the crime but seeks to excuse or justify its commission.  It does not negate specific elements of the crime.'"  *People v. Reese*, 815 N.W.2d 85, 101 n.76 (Mich. 2012) (quoting *Dupree*, 788 N.W.2d at 405 n.11).  The defendant has the initial burden of production on the issue of self-defense.  *Dupree*, 788 N.W.2d at 709–10 ("[O]nce the defendant injects the issue of self-defense and satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist, the prosecution

17

bears the burden of proof "'to exclude the possibility that the killing was done in self-defense. . . .'").

There were only three people present when Petitioner shot Kauffman.  Only Petitioner and Morgan Wire were available to testify.  No matter how angry or agitated or violent Kauffman may have been in the period of time preceding the moments on the side of the road—anger, agitation and violence that others may have been able to testify about[1]—only Petitioner and Wire could describe the circumstances on the ground at the time Petitioner fired the shot.  Critically, Wire's testimony did not support Petitioner's version of the events or his claim of self-defense.  Morgan said Petitioner had an open gun case on the front seat of his Jeep when they left the cottage; thus, her testimony did not support Petitioner's claim about pulling the gun from behind the back seat and loading it.  Moreover, Wire's testimony did not support Petitioner's claims that Kauffman had hit either of the other vehicles.  She never saw Petitioner out of the Jeep.  She never saw the physical fight that Petitioner described.  She just heard yelling and then a gunshot.

Absent Petitioner's testimony, there was no evidence from which a jury could conclude that "at the time defendant acted he 'honestly and reasonably believed that he was in danger of being killed or seriously injured' and he 'honestly and reasonably believed he needed to use deadly force in self-defense.'"  (Mich. Ct. App. Op., ECF No.

---

[1] Petitioner argues that the jury could have based its determination on testimony from Morgan Wire or the victim's mother regarding the victim's agitated demeanor and behavior.  (Pet'r's Br., ECF No. 1, PageID.45.)

6-29, PageID.1629.)  Petitioner admitted he fired the shot and he acknowledged that he fired the shot intending to kill Kauffman.  Counsel had no defense against the charges without Petitioner's testimony regarding self-defense or the collateral benefit of that testimony to mitigate the charge from murder to manslaughter.  The court of appeals' conclusion that permitting Petitioner to take the stand was professionally reasonable is inescapable—no matter how much of a liar Petitioner appeared to be once he took the stand.

Petitioner contends further that this Court cannot resolve the ineffective assistance of counsel claim without conducting an evidentiary hearing regarding counsel's intentions in putting Petitioner on the stand or the adequacy of counsel's investigation into the evidence that so effectively impeached Petitioner's credibility.  Petitioner is simply wrong.

As noted above, the question before this Court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105. The "any reasonable argument" language from *Harrington* reflects the double deference owed.  The *Harrington* court described what the habeas court should consider and what it should not consider:

> When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.  In *Harrington*, the issue was whether counsel could have reasonably decided to ***not*** consult a blood expert.  The *Harrington* court did not evaluate counsel's decision based on the reasons offered by counsel.  Indeed, it does not appear that there was ever a hearing that disclosed counsel's motivation for his

decision.  Instead, the *Harrington* court considered the reasonableness of the decision in the abstract.  That approach necessarily follows from *Strickland*'s requirement that, to overcome the presumption of regularity, the defendant must show that the challenged action ***cannot*** be considered sound trial strategy.  If the reviewing court can conceive of a sound strategy that includes the challenged action, the matter is resolved.

*Harrington* reversed a Ninth Circuit *en banc* decision.  The *Harrington* court criticized the Ninth Circuit for limiting its inquiry to counsel's actual thinking:

> The Court of Appeals erred in dismissing strategic considerations like these as an inaccurate account of counsel's actual thinking.  Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, *Wiggins, supra*, at 526–527, neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam).  After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.  466 U.S., at 688.

*Harrington*, 562 U.S. at 109–10.  Under that reasoning, unless Petitioner shows the Michigan Court of Appeals that its proposed strategic reason for the challenged action was, in fact, not the reason for counsel's action, the habeas court does not need to inquire any further into counsel's actual reason for his or her action (or inaction).  Therefore, in Petitioner's case, this Court does not need to conduct an evidentiary hearing to determine counsel's actual reason for putting Petitioner on the stand to resolve the ineffective assistance claim.

The Michigan Court of Appeals' factual determinations with regard to the testimony offered at trial are well-supported by the record and Petitioner has failed to demonstrate that the court's rejection of Petitioner's ineffective assistance claim is contrary to, or an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

## IV.   Presumption of innocence

Petitioner contends that some jurors may have seen him being accompanied by four police officers in the parking lot of the courthouse.  Petitioner claims that seeing Petitioner so secured may have irreparably damaged the presumption that Petitioner was innocent and, thus, the fairness of his trial.  The Michigan Court of Appeals disagreed.

The court of appeals acknowledged that Petitioner's claim would have merit if the jurors had seen him shackled in the courtroom, but that the fairness concerns that support that prohibition against visible courtroom shackling do not "extend to safety precautions taken by officers while transporting a defendant to and from a courtroom."  (Mich. Ct. App. Op., ECF No. 6-29, PageID.1270) (internal quotes omitted).  The appellate court also determined that Petitioner had failed to demonstrate prejudice, particularly where "the trial court instructed the jury that it had to start with the presumption that the defendant was innocent, maintain that presumption throughout the trial, and, unless satisfied beyond a reasonable doubt that he was guilty of the charges against him, return a verdict of not guilty" and "[j]urors are presumed to follow their instructions, and instructions are presumed to cure most errors."  (*Id*.) (internal quotes omitted).

21

Petitioner's argument is based on the Supreme Court's decisions in *Estelle v. Williams*, 425 U.S. 501 (1976), and *Holbrook v. Flynn*, 475 U.S. 560 (1986).  In *Estelle*, the Supreme Court considered whether an accused who is compelled to wear identifiable prison clothing at his trial by a jury is denied due process.  The court concluded that "the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes . . . ."  *Estelle*, 425 U.S. at 512.  To avoid undermining the presumption of innocence, the court called upon trial courts to "do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience."  *Id.* at 504.  The court recognized that the accused's prison garb would serve as a "constant reminder" that might "affect a juror's judgment" and operate as "a continuing influence throughout the trial . . . ."  *Id.* at 504–05.

In *Holbrook*, the Supreme Court applied the *Estelle* analysis to another practice that might "pose . . . a threat to the 'fairness of the factfinding process' . . . : the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial . . . ."  *Id.* at 568.  Although the *Holbrook* court acknowledged the possible prejudice that might result from the placement of four state troopers behind Flynn during the trial, it reversed the appellate court's grant of the writ because the practice was not inherently prejudicial and Flynn had shown no prejudice.

Weaving together the holdings of these cases, Petitioner argues that "[t]he fact that jurors saw [Petitioner] escorted to [a] marked police car by four officers violated his constitutional right to a fair trial."    (Pet'r's Br., ECF No. 1, PageID.52.) Petitioner's argument might certainly be a good faith extension of the principles underlying the Supreme Court decisions in *Estelle* and *Holbrook*.  But that would not warrant habeas relief.    Petitioner must show that the state court of appeals' determination was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner asked the state court of appeals to extend the principles of *Estelle* outside the courtroom.[2]  Because Petitioner's argument depends on an extension of clearly established federal law, he cannot prevail.  *See*, *e.g.*, *White*, 572 U.S. at 427 ("AEDPA's carefully constructed framework 'would be undermined if habeas courts

---

[2] The Sixth Circuit considered the same sort of argument for an extension as grounds for habeas relief in *Mendoza v. Berghuis*, 544 F.3d 650 (6th Cir. 2008).  In *Mendoza*, the petitioner argued that jurors had seen him in shackles outside the courtroom during transport to or from the courtroom.  The Sixth Circuit concluded that rejecting such a claim could not run afoul of law clearly established by the Supreme Court because the Supreme Court had never held that a defendant's constitutional rights were violated in that context.  *Mendoza*, 544 F.3d at 655; *see also Wilkins v. Lafler*, 487 F. App'x 983, 989 (6th Cir. 2012); *Keys v. Booker*, 798 F.3d 442, 454–56 (6th Cir. 2015) *Studier v. McCauley*, No. 20-1417, 2020 WL 6483886, at *2 (6th Cir. Sept. 28, 2020).  Indeed, the dissenting justices in *Deck v. Missouri*, 544 U.S. 622, 656 (2005), the Supreme Court's more recent authority on the propriety of courtroom shackling, noted that prisoner routinely and appropriately must walk the courthouse halls wearing visible restraints.  Moreover, Petitioner's argument would appear to run counter to the authority of *Holbrook*.  If the presence of 12 uniformed officers in the courtroom, Holbrook, 475 U.S. at 570 ("four uniformed state troopers, two Deputy Sheriffs, and six Committing Squad Officers"), did not call into question the fairness of defendant Holbrook's trial, the presence of 4 uniformed officers transporting Petitioner in the parking lot would certainly not jeopardize the fairness of Petitioner's trial.

introduced rules not clearly established under the guise of extensions to existing
law.'") (quoting *Yarborough*, 541 U.S. at 666).

Petitioner also argues that his counsel rendered ineffective assistance because
counsel failed to raise or develop this claim in the trial court.  The merits of that claim
do not entirely depend on the merits of Petitioner's habeas claim that his trial was
rendered unfair when the jurors saw him being transported by four police officers.
Put differently, even though the validity of Petitioner's habeas claim regarding his
police escort requires the existence of clearly established supporting federal law, the
validity of counsel's argument regarding the police escort to the state court does not.
The state court could rely on a good faith argument extending existing Supreme Court
authority, or based upon other state or federal authority, even though this Court
considering the issue on habeas review cannot.  Petitioner's ineffective assistance
claim fails, nonetheless.

"Omitting meritless arguments is neither professionally unreasonable nor
prejudicial."  *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).  Counsel's pursuit of
Petitioner's claim would have been meritless.  Petitioner was required to show
prejudice to prevail.  The *Holbrook* decision explained why the presence of 12 officers,
even in the courtroom, was very different than shackling the defendant or compelling
him to wear prison garb:

> The chief feature that distinguishes the use of identifiable security
> officers from courtroom practices we might find inherently prejudicial is
> the wider range of inferences that a juror might reasonably draw from
> the officers' presence.   While shackling and prison clothes are
> unmistakable indications of the need to separate a defendant from the
> community at large, the presence of guards at a defendant's trial need

> not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Holbrook*, 475 U.S. at 569 (citation omitted). Moving the locus of the jurors' possible observation out of the courtroom—where even prison garb and visible shackles can be acceptable—weakens Petitioner's claim even more.

The Sixth Circuit has held that jurors seeing a defendant shackled outside the courtroom does not, without more, render a trial unfair; instead the defendant must also show actual prejudice—a showing that the defendant could not make in light of the instructions regarding the presumption of defendant's innocence until proven guilty. *United States v. Moreno*, 933 F.2d 362, 368 (6th Cir. 1991); *see also United States v. Rodgers*, 85 F. App'x 483, 485 (6th Cir. 2004) (defendant seen in prison jumpsuit and in the custody of officers outside of the courtroom). That is the conclusion that the Michigan Court of Appeals reached here: transportation of Petitioner by uniformed officers across a parking lot is not inherently prejudicial and any hint of prejudice was ameliorated by the instructions (Trial Tr. V, ECF No. 6-21, PageID.1019) that Petitioner must be presumed innocent and that the presumption continues throughout the trial and until the jury is satisfied beyond a reasonable doubt, based on the evidence properly admitted in the case, that Petitioner was guilty.

The court of appeals' conclusion is well-supported by the record and by federal law, whether clearly established by the Supreme Court or otherwise.  Therefore, the appellate courts' further conclusion that counsel was not ineffective for failing to pursue this meritless claim further is neither contrary to, nor an unreasonable application of, *Strickland*, the clearly established federal law regarding ineffective assistance of counsel.

Petitioner is not entitled to habeas relief on his claims relating to the jurors' potential observation of Petitioner being escorted by multiple uniformed officers in the courthouse parking lot.

### Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466, 467 (6th Cir. 2001) (per curiam).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.*  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, I have examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by

demonstrating that . . . jurists of reason could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

Moreover, although I conclude that Petitioner has failed to demonstrate that he is in custody in violation of the constitution and has failed to make a substantial showing of a denial of a constitutional right, I would not conclude that any issue Petitioner might raise on appeal would be frivolous.  *Coppedge v. United States*, 369 U.S. 438, 445 (1962).

## Recommended Disposition

For the foregoing reasons, I recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  Finally, I recommend that the Court not certify that an appeal would not be taken in good faith.

Dated:  November 5, 2021                    /s/ Phillip J. Green
                                        PHILLIP J. GREEN
                                        United States Magistrate Judge

## NOTICE TO PARTIES

ANY OBJECTIONS to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).